## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR TIERONE BANK,<br><br>          Plaintiff,<br><br>v.<br><br>GILBERT G. LUNDSTROM, DAVID L. HARTMAN, JAMES A. LAPHEN, RANDALL B. KIDD, DELMAR E. WILLIAMS, CHARLES W. HOSKINS, CAMPBELL R. MCCONNELL, and ANN L. SPENCE,<br><br>          Defendants. | Case No. 8:13-CV-168 |

### COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

For its Complaint against the Defendants, Plaintiff Federal Deposit Insurance Corporation ("FDIC") as Receiver for TierOne Bank ("FDIC-R") pleads as follows:

### I.  INTRODUCTION

1.      The FDIC brings this case in its capacity as Receiver for TierOne Bank ("TierOne" or "Bank"), pursuant to authority granted by 12 U.S.C. § 1821.  The FDIC-R seeks to recover damages of at least $40 million because of the gross negligence and breaches of fiduciary duty of Defendants Gilbert G. Lundstrom, David L. Hartman, James A. Laphen, Randall B. Kidd, Delmar E. Williams, Charles W. Hoskins, Campbell R. McConnell, and Ann L. Spence—eight of the Bank's former directors and/or officers—in recommending and/or approving eight poorly underwritten acquisition, development, and construction ("ADC") loans from April 21, 2006, through September 17, 2008 ("Transactions").

2.      As directors and/or officers, Defendants had a duty to ensure compliance with the Bank's Loan Policy ("Loan Policy"), safe and sound banking practices and federal regulations,

and to make informed decisions.   Specifically, Defendants were required to ensure that the borrowers were creditworthy, that there was a clear repayment source, and that the loan would not result in unnecessary risk.   By repeatedly ignoring Loan Policy violations that were clear on the face of the loan analysis memoranda and exhibits that they received prior to approving the loans, Defendants abdicated each and every one of these responsibilities as directors and officers of the Bank.

3.       Each of the Transactions suffered from multiple deficiencies that made the risk of loss clear.   The loans relied on appraisals that were inconsistent with the Loan Policy and federal regulations, had excessive loan-to-value ("LTV") or loan-to-cost ("LTC") ratios, and lacked the takedown commitments required by the Loan Policy.   Defendant Kidd routinely approved advances on the loans that were not commensurate with the work completed.   In addition to these significant underwriting deficiencies and regulatory violations, one or more of the loans was deficient because of over concentrations of credit with one borrower, poor FICO scores of guarantors and principals, failure to verify credit information provided by borrowers, failure to verify plans for repayment based on sale of developed lots when no funds were budgeted for development, lack of an approved budget, ignoring known poor market conditions, or continuing to lend to borrowers who had demonstrated unreliability or inability to pay.   Despite these deficiencies, the Defendants recommended and approved the loans.

4.       By recommending and approving the loans despite their many deficiencies, the Defendants acted grossly negligently and breached their fiduciary duties.   Defendants Lundstrom and Laphen approved all 8 loans; Defendants Hoskins and McConnell approved 5 loans; Defendant Williams approved 4 loans and recommended another; Defendant Kidd recommended 6 loans; and Defendant Spence approved 3 loans.   No Defendant voted against any of the loans.

5.     In addition to improvidently recommending and approving the loans, Defendants also modified and extended the loan terms on a number of occasions.  These modifications and extensions had the practical effect of delaying the ultimate default of certain loans and thereby concealed the Defendants' improper lending practices.

6.     The FDIC-R seeks recovery of damages of no less than $40 million caused by the Defendants' gross negligence and breaches of fiduciary duties in violating the established Loan Policy and in violating prudent, safe, and sound banking practices and federal regulations.

## II.    PARTIES

### A.    PLAINTIFF

7.     On June 4, 2010, TierOne was closed and the FDIC-R was appointed as Receiver pursuant to 12 U.S.C. 1821(c).  At that time, the FDIC-R succeeded to all rights, titles, powers, and privileges of TierOne, and its depositors, account holders, other creditors, and stockholders. 12 U.S.C. § 1821(d)(2)(A)(i).

### B.    DEFENDANTS

8.     Gilbert G. Lundstrom ("Lundstrom") was Chief Executive Officer from 1994 until January 2010, a director from 1994 until June 4, 2010, and Chairman of the Board of Directors ("Board") from 1998 until January 2010.

9.     David L. Hartman ("Hartman") was Senior Vice President and Director of Real Estate Lending from 1995 to June 4, 2010.

10.     James A. Laphen ("Laphen") was the President, Chief Operating Officer, and a director from 2000 until June 4, 2010.

11.     Randall B. Kidd ("Kidd") was Vice President from January 1, 2006 until September 2008.  Defendant Kidd was in charge of the Las Vegas, Nevada loan production

office ("Las Vegas LPO"). Kidd filed for Chapter 7 bankruptcy on March 17, 2011. By order dated November 2, 2012, the United States Bankruptcy Court for the District of Nevada granted the FDIC-R's Motion for Relief from Stay, and authorized the FDIC-R "to name Kidd as a defendant in any action the FDIC-R may subsequently bring arising from Kidd's alleged acts of negligence, gross negligence and breaches of fiduciary duty committed while he was an officer of TierOne."

12.     Delmar E. Williams ("Williams") was Senior Vice President and Chief Credit Officer from January 2, 1968 until April 25, 2008.

13.     Charles W. Hoskins ("Hoskins") was a director from March 2004 to June 4, 2010.

14.     Campbell R. McConnell ("McConnell") was a director from 1974 to June 4, 2010.

15.     Ann L. Spence ("Spence") was a director from January 1989 to September 2008.

III.    **JURISDICTION AND VENUE**

16.     The Court has subject matter jurisdiction over this matter, as actions in which the FDIC-R is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et seq.*; 12 U.S.C. § 1819(b)(l) and (2), and 28 U.S.C. §§ 1331 and 1345.

17.     This Court has personal jurisdiction over all Defendants. All Defendants are residents of the State of Nebraska except Kidd and all Defendants conducted the business of the Bank in the State of Nebraska and otherwise purposefully availed themselves of jurisdiction in Nebraska by, among other means, causing the approval and funding of the loans.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Bank was located in this district and a substantial part of the events or omissions giving rise to the claims asserted by the FDIC-R occurred in this district.

## IV.   FACTUAL ALLEGATIONS

## A.   BACKGROUND

19.    The Bank was founded in 1907 as First Federal Savings & Loan Association.  In 2002, the Bank changed its name to TierOne Bank and converted to a stock savings bank charter.

20.    In 2004, Defendants Lundstrom, Laphen, McConnell and Spence adopted an aggressive growth strategy focused on high-risk commercial real estate ("CRE") loans, including ADC loans. TierOne's total assets increased from $2.2 billion in 2003 to $3.4 billion in 2006. This growth strategy caused adversely classified assets to increase $30 million to $53.7 million from November 2005 until February 2007, and then to $260.3 million by 2008, and to $581.8 million by 2009.

21.    In 2006, Defendants Lundstrom, Laphen, McConnell, Hoskins and Spence approved a strategic plan to generate so-called "Turbo Assets," which refers to high-risk loans bearing interest rates greater than traditional mortgage loans, like CRE and ADC loans.  These same Defendants then directed the Bank to open the Las Vegas LPO.  Defendants Lundstrom and Laphen employed Defendant Kidd and gave him managerial control over the Las Vegas LPO.

22.    In derogation of their duty to engage in safe and sound banking practices, Defendants recommended and approved numerous large high-risk ADC loans in the vicinity of Las Vegas, Nevada, an unfamiliar and volatile market.  In their haste to aggressively grow the Bank, Defendants Laphen, Lundstrom, Hoskins, Spence, and McConnell abandoned the Bank's long history of making traditional residential and business loans in its primary lending area.

23.    Defendants Laphen and Lundstrom created a bonus system for Defendant Kidd, who they put in the charge of the LasVegas LPO, that incentivized the origination of large, fee-

producing loans in Las Vegas, without accountability for loan performance.

24.     Defendants Laphen, Lundstrom, Hoskins, Spence, and McConnell caused the creation or maintenance of deficient underwriting and loan approval systems that ensured that loans were not based on prudent lending practices.  Thus, Defendant Kidd routinely originated, and the other Defendants either recommended or approved loans that violated the Loan Policy, prudent lending practices and federal regulations.

25.     Defendants Lundstrom and Laphen allowed Defendant Kidd to violate the Loan Policy for draws on ADC loans, which resulted in numerous loans being fully funded but the projects being incomplete or in some instances non-existent.

26.     The Las Vegas LPO quickly generated more than $200 million in ADC loans — over 75 percent of which became adversely classified by the end of 2008.

27.     Even after Defendant Kidd was fired in 2008, and the vast majority of the loans he originated had been identified as serious problems,  Defendants Laphen, Lundstrom, Hoskins and McConnell continued to advance additional credit to Defendant Kidd's stable of bad borrowers and continued to violate the Loan Policy, prudent lending practices, and federal regulations, further exacerbating the losses.

28.     In sum, each of the Defendants was grossly negligent and breached his or her fiduciary duties by approving, recommending, and/or administering the Transactions in violation of the Loan Policy, prudent lending practices, and federal regulations.

**B.     THE LOAN APPROVAL PROCESS AND LOAN POLICY**

29.     Loans between $1 million and $5 million required the approval of three out of four named individuals (during the relevant time period, these individuals included Defendants Lundstrom, Laphen and Williams).  Loans between $5 million and $10 million required the

approval of all four of the named individuals.  Loans over $10 million or loans for which the total credit exposure to the borrower exceeded $20 million required Board approval.  Board approval was required for the Towne Vistas, Brother Sonny, Jericho Heights and Wagner Homes I loans.

30.    Prior to approving loans, in practice, the loan approvers received loan packages prepared by the originating officer and usually consisting of a loan analysis memorandum, summaries of the borrower's and guarantors' financial statements and tax returns, maps, a risk rating form, a name search, and media reports regarding the market or the project.  The loan analysis memorandum contained the subject property address, loans-to-one borrower analysis, the guarantors' identity, background and net worth, the loan terms, the LTV ratio, loan purpose and use of funds, borrower cost and equity, collateral analysis, and an economic summary.

31.    Loans were approved without a meeting or telephone conference among loan recommenders or approvers.  The Bank had no loan committee and the Board did not meet to discuss the loans subject to its approval.  In most of the Transactions, there was no meeting of the recommenders or approvers to discuss the merits of the loan.  The loan package was merely passed from one approving person to the next either by courier or mail, with the approval document attached.  Thus, the loan approval process lacked the traditional checks provided by questioning and discussing the loans at a meeting.

32.    The Loan Policy required for each loan: (a) a cash flow analysis of borrower and guarantor financial statements and tax returns to determine if cash flow is sufficient to service the debt if project sales fail to meet projections; (b) an appraisal review for a loan in excess of $1 million; (c) a takedown commitment for 50 percent of the lots for land development loans; (d) 35 percent cash equity for a land loan and 15 percent cash equity for a development and

construction loan; (e) a maximum LTV ratio of 65 percent for a land loan and 75 percent for a development loan; (f) a maximum LTC ratio of 65 percent for a land loan and 100 percent for a development and construction loan; and (g) a project must be on plan and on schedule before additional funds are advanced by the Bank.  These policies, as well as prudent lending practices and federal regulations, were repeatedly and blatantly violated by the Defendants in connection with the Transactions.

### C.      MISMANAGEMENT OF LAS VEGAS LPO

33.      Defendant Kidd was in charge of the Las Vegas LPO, which opened in January 2006.  Defendant Kidd was paid a bonus of 10-12.5 percent of all fee income generated from the Las Vegas LPO.  Defendant Kidd's bonus plan enabled him to earn over $500,000 per year in 2006 and 2007, over five times his base salary.  Because the bonus was based on the Bank's fees at closing, rather than the ultimate performance of the loans, Defendant Kidd was incentivized to originate as many large loans as possible without regard to credit quality.

34.      The Loan Policy and prudent lending practices required internal controls on draws on ADC loans to assure that advances were commensurate with the work on the ground.  But with respect to the Las Vegas LPO, Defendant Kidd approved draws on ADC loans without following the internal controls imposed on other loan officers.  Defendants ignored warnings that Defendant Kidd was over-advancing funds on ADC loans and allowing funds to be diverted from their intended purpose.  As a result of the gross negligence and breaches of fiduciary duty, the loan proceeds were fully advanced, but planned development or construction was either incomplete or in one case, never started.

**D.    DEFENDANTS IMPROVIDENTLY APPROVED OR RECOMMENDED EIGHT LOANS THAT VIOLATED THE LOAN POLICY AND PRUDENT LENDING PRACTICES.**

35.    The Transactions were approved despite numerous underwriting deficiencies including excessive LTV or LTC ratios, no takedown commitments, failure to obtain a current "as is" or discounted bulk value appraisal, and other deficiencies such as advances on ADC loans that were not commensurate with the work completed.   In addition to these significant underwriting deficiencies and regulatory violations, one or more of the loans involved over concentrations of credit with one borrower, poor FICO scores of guarantors and principals, failure to verify credit information provided by borrowers, failure to verify plans for repayment based on sale of developed lots when no funds were budgeted for development, lack of an approved budget, ignoring known poor market conditions, or continuing to lend to borrowers who had demonstrated unreliability or inability to pay.

### Brother Sonny, LLC

36.     On November 27-28, 2006, Defendants Kidd and Hartman recommended approval of a $17.5 million loan to Brother Sonny, LLC ("Brother Sonny").  On December 4-7, 2006, Defendants Williams, Lundstrom, and Laphen approved the loan, and on December 11, 2006, Defendants Hoskins, Spence and McConnell also approved it.  The purpose of the loan was to acquire and develop 48 lots for single-family homes in Boulder City, Nevada.

37.    The loan violated the Loan Policy, federal regulations, and prudent underwriting standards because: (a) no appraisal was obtained prior to approval; (b) the LTC ratio exceeded 100 percent; (c) the LTV ratio exceeded 62.5 percent, which was a specific condition required for this particular loan; (d) no takedown commitments existed; (e) the borrower contributed no equity to the project; and (f) the loan was approved without proper analysis and verification of

the financial condition of the borrower and guarantors and their ability to repay the loan. In further violation of the Loan Policy, federal regulations, and prudent lending practices, loan disbursements exceeded actual development outlays.

38.     The loan analysis memorandum provided to the Defendants prior to approval revealed the absence of an appraisal, an over concentration of loans to entities controlled by this borrower, the lack of verified financial information, and the borrower's poor credit history.

39.     The Defendants also ignored specific warnings in the loan analysis memorandum including the following: (a) the Las Vegas real estate market was in decline; (b) all segments of the Las Vegas housing market were slowing with an unabsorbed seven month supply of housing; (c) new home sales were down 22.3 percent; (d) existing home sales were down 40.7 percent; (e) new home permits were off 35.5 percent; and (f) the guarantors had poor FICO scores.

40.     Defendants Kidd, Hartman, Williams, Lundstrom, Laphen, Hoskins, Spence and McConnell were grossly negligent and in breach of their fiduciary duties in connection with the Brother Sonny transaction and have caused damages related thereto estimated to be at least $7.6 million.

## Jericho Heights, LLC

41.     The principals in Brother Sonny were Guarantor A and his wife.[1]  Guarantor A and his entities had several major problem loans with the Bank.  On September 28, 2008, Defendants Lundstrom, Laphen, Hoskins, and McConnell approved a $13.6 million loan to another Guarantor A entity, Jericho Heights, LLC ("Jericho Heights").

42.     The purpose of that loan was to pay the $3.2 million in unpaid Brother Sonny vendors, provide Guarantor A with $2.4 million in overhead funds at the rate of $100,000 per

---

[1]  Guarantor A referenced herein represents an individual guarantor whose name has been withheld to protect his privacy.   The names of individual guarantors will be provided once an appropriate protective order is in place.

month, and to pay off loans on other failed Guarantor A projects. At this point, the Bank had loaned $24.3 million to Guarantor A entities.

43.     The loan violated the Loan Policy, federal regulations, and prudent lending standards because (a) the Defendants ignored Guarantor A's obvious integrity and reliability issues; (b) the Defendants failed to obtain current appraisals on any of the collateral; and (c) the loan analysis memorandum disclosed that the poor real estate market made loan repayment unlikely.

44.     The failure to obtain current appraisals was disclosed to Defendants Lundstrom, Laphen, Hoskins and McConnell in the loan analysis memorandum prior to approval of the loan. Without current appraisals, there was no way for the Defendants to know if the $6.1 million in new money advanced to Jericho Heights would either enhance the value of the collateral in an amount commensurate with the new advance, or to determine the degree to which TierOne was currently collateralized on its existing loans.

45.     Guarantor A had failed to pay Brother Sonny as promised, incurred large cost overruns on Brother Sonny and Jericho Heights, failed to pay vendors, and on another TierOne loan paid from the Jericho Heights proceeds, Eldorado Estates, Guarantor A had drawn nearly $2 million for lot development, but there was no evidence of any substantial development at the site. Guarantor A was also insolvent and unable to pay overhead.  All of these facts were disclosed in the loan analysis memorandum provided to each Defendant before they approved the loan.

46.     The loan analysis memorandum also stated: "Poor residential market in Las Vegas.  Absorption of both developments is expected to be extremely slow."  Defendants ignored this red flag in making the loan.

47.     Defendants Lundstrom, Laphen, Hoskins, and McConnell  were grossly negligent and in breach of their fiduciary duties in connection with the Jericho Heights transaction and have caused damages related thereto estimated to be at least $9.3 million.

## Celebrate Legends, LLC

48.      On August 11, 2006, Defendants Williams, Laphen, and Lundstrom approved a $6.65 million loan to Celebrate Legends.  Defendants Kidd and Hartman recommended this loan. The purpose of the loan was to refinance a TierOne "acquisition loan," provide soft cost improvements for mapping, and to acquire an additional .87 acre tract.

49.     The loan violated the Loan Policy, federal regulations, and prudent lending standards because: (a) the borrower had no cash equity in the project; (b) the guarantors had poor FICO scores; (c) repayment of the loan was to come from sale of developed lots but no funds were budgeted for development; (d) there were no takedown commitments for the lots; (e) the borrower had no cash equity in the project; (f) the loan exceeded LTC limits; and (g) the loan proceeds were not used for the stated purposes of the loan.

50.     The Celebrate Legends July 27, 2006 loan analysis memorandum erroneously described the TierOne loan being refinanced as a $2.796 million loan land acquisition loan. Although the stated purpose of the $2.796 million loan was to refinance an acquisition loan made by another financial institution on 14.2 acres of land, that loan was actually used to allow the borrower to refinance a loan in which the borrower had cashed out its investment in the collateral. The borrower and its principals had owned the collateral for 15-20 years. Thus the $6.65 million loan allowed the borrower to cash out his investment for the third time in three years for continually escalating amounts. This imprudent practice was known to the Defendants

who approved and recommended the $6.65 million loan because the same five Defendants had approved and recommended the $2.796 million loan.

51.     Despite this, the memorandum recommending the $6.65 million loan stated that $6 million of the loan proceeds were to be used for land acquisition, which made no sense even if the earlier loan had been a land acquisition loan.  Moreover, the loan analysis memorandum represented that the repayment of the $6.65 million loan would come from the sale of developed lots.  However, no funds were budgeted in either the $2.796 million loan or the $6.65 million loan for development of the lots.  If the loan was intended as a development loan, there were no takedown commitments for any proposed lots in violation of the Loan Policy.

52.     The Loan Policy required that the borrower have 35 percent cash equity at closing on a land loan or 10 percent cash equity at closing on a development loan.  The Celebrate Legends loan analysis memorandum states that the borrower's total cost in the project was $11.35 million, and discloses that this "cost" figure was derived by using the Celebrate Legends appraised value, not its actual cost.  The use of appraised value rather than actual cost inflated the denominator of the LTC ratio and effectively negated the Loan Policy requirements for LTC ratios and required cash equity.  In any event, there was no cash equity in the Celebrate Legends project in violation of the Loan Policy.

53.     Similarly, the Loan Policy required an appraisal review on loans in excess of $1 million.  There is no evidence that such review ever took place.

54.     The Loan Policy, federal regulations, and prudent lending standards required that loan disbursements should not exceed actual development or construction outlays. Defendant Kidd approved loan proceeds to be advanced to pay personal debt of the principals of Celebrate Legends totaling $442,001.53, a debt of Celebrate Legends in the amount of $1,008,299, an

$800,000 consulting fee to one of the principals of Celebrate Legends, and a $173,876.10 loan advance to the borrower for unstated and undocumented purposes. None of these advances was related to the stated purposes of the loan and none of the advances enhanced the value of the collateral securing the loan.

55.     The one advance that was consistent with the purpose of the loan was for $800,000 to acquire a .87 acre tract, but this advance violated the Loan Policy, federal regulations, and prudent lending standards because, based on the appraisal obtained by the Bank, the LTV ratio on the .87 acre tract was 96.38 percent.

56.     The loan analysis memorandum also disclosed that the guarantors had poor FICO scores, which did not support qualification for a $6.65 million loan.

57.      Defendants Williams, Laphen, Lundstrom, Kidd and Hartman were grossly negligent and in breach of their fiduciary duties in connection with the Celebrate Legends transaction and have caused damages related thereto estimated to be at least  $4.6 million.

## Towne Vistas, LLC

58.     The Defendants approved and/or recommended two loans to Town Vistas, LLC.

59.     On October 6, 2006, Defendants Spence, Laphen, Lundstrom, Hoskins, and McConnell approved the first of two loans to Towne Vistas, LLC ("Towne Vistas I") in the amount of $27 million.  Defendants Williams, Kidd and Hartman recommended this loan.  The purpose of the loan was to finance the construction of 62 single-family, attached production condominium homes in Las Vegas.

60.     The loan violated the Bank's Loan Policy, federal regulations, and prudent lending standards because: (a) there was an over concentration of credit with the principals of Towne Vistas; (b) the Defendants failed to obtain an "as is" or discounted bulk sales value

appraisal of the collateral; (c) the Defendants failed to obtain an appraisal review; (d) there was no evidence of contracts to purchase any of the condominiums; (e) the Las Vegas condominium market was collapsing; (f) loan proceeds were advanced without proof of work completed commensurate with the advances; and (g) Defendant Kidd was in business with one of the principals of the borrower.

61.     The Bank's total extensions of credit to the principals in Towne Vistas were nearly $36 million upon approval of the Towne Vistas I loan.  Although  the Loan Policy required special attention to concentrations of credit over $20 million, the Defendants failed to exercise due care in underwriting and approving this major loan.

62.     The Defendants failed to obtain a current "as is" appraisal or discounted bulk sales value appraisal on the project.  This violation was disclosed in the loan analysis memorandum, which never mentions either an "as is" or discounted bulk sales value and shows instead that the appraisal was based on the sum of the proposed selling prices of the condominium units to be built.

63.     The loan analysis memorandum also states that there were 33 sales or reservations of the 62 units.  All 33 were mere reservations, which were not binding, and in fact, none were consummated. The Defendants were grossly negligent in not using due diligence to determine if these were sales or reservations.

64.     The loan analysis memorandum disclosed that the Las Vegas housing market had peaked and was slowing, that year-to-date sales activity of both single-family and condominiums were down to their lowest point in three years, that no change was projected in the market, that the inventory of housing was up to 6.5 months, that foreclosures were up 100 percent over the previous quarter, that new home permits had dropped 53.7 percent from one year ago, that new

home sales were down 6.6 percent, and that existing home sales were down 34.5 percent.  This information should have alerted the Defendants that the Towne Vistas project, by the time it was completed, could potentially be facing at best a very soft market and at worst the bursting of a speculative bubble.

65.    The Defendants failed to obtain an appraisal review in violation of the Loan Policy.  An appraisal review would have revealed that the assumption that all the condominium units were "pre-sold" was a baseless assumption.

66.    Defendant Kidd fully disbursed the proceeds of this loan, even though the project was not completed or occupied during the term of the loan.

67.    Defendant Kidd had a conflict of interest in that he was personally involved in numerous business ventures with one of the principals of the borrower.

68.    Defendants Spence, Laphen, Lundstrom, Hoskins, McConnell, Williams, Kidd and Hartman were grossly negligent and in breach of their fiduciary duties in connection with the Towne Vistas I transaction.

69.    On September 11, 2008, the Defendants "doubled down" on the Towne Vistas project by approving $5.25 million of new money and refinancing the Towne Vistas I loan ("Towne Vistas II"). The Towne Vistas II loan was approved by Defendants Laphen, Lundstrom, Hoskins, and McConnell.

70.    The loan violated the Loan Policy, federal regulations, and prudent lending standards because: (a) the borrower had demonstrated unreliability and possible dishonesty; (b) there was an over concentration of credit with the principals of Towne Vistas; (c) the Defendants again failed to obtain an "as is" or discounted bulk sales value appraisal of the collateral; (d) the Defendants failed to obtain an appraisal of additional collateral provided by the borrower; (e) the

Defendants advanced additional funds to the borrower without evidence that these advances were adequately secured; and (f) the Defendants ignored the extremely poor market for condominiums in Las Vegas.

71.     The Bank's total extensions of credit to the principals in Towne Vistas were over $32 million upon approval of the Towne Vistas II loan.  Although the Loan Policy required special attention to concentrations of credit over $20 million, the Defendants failed to exercise due care in underwriting and approving this major loan.

72.     As they did on Towne Vistas I, the Defendants failed to obtain a current "as is" or discounted bulk sales value appraisal on the project.  Although the Bank took additional collateral on Towne Vistas II, the Defendants did not obtain appraisals on the additional collateral.  In addition, the Defendants were grossly negligent by advancing additional funds to Towne Vistas without any evidence, from an appraisal or otherwise, that those funds would enhance the value of the Bank's collateral position by at least as much as the funds that were being advanced.  The loan analysis memorandum disclosed the lack of proper appraisals to the Defendants.

73.     The Towne Vistas II loan analysis memorandum rated the loan a "5", which meant the loan was an "unsatisfactory credit risk" under the Loan Policy.

74.     The loan analysis memorandum disclosed to the Defendants that the condominium market in Las Vegas was poor and that the borrower had "experienced cost overruns and delays."  Indeed, $3 million of the loan proceeds was used to cover the cost overruns.  None of the condominiums were ever sold.

75.    Defendants Laphen, Lundstrom, Hoskins, and McConnell were grossly negligent and in breach of their fiduciary duties in connection with the Towne Vistas II transaction and have caused damages related thereto estimated to be at least $13.9 million.

## Wagner Homes I

76.    On May 21-22, 2007, Defendants Lundstrom, Laphen, Williams, Hoskins, McConnell and Spence approved a loan to Wagner Homes, Inc. in the amount of $2.416 million ("Wagner Homes I").  Defendants Kidd and Hartman recommended Wagner Homes I.

77.    The purpose of the loan was to refinance the Bank's existing $1.35 million model home loan secured by four homes and to refinance three other model homes that the borrower supposedly funded out of pocket.

78.    The loan violated the Loan Policy, federal regulations, and prudent lending standards because: (a) the borrower was having cash flow problems; (b) the Defendants failed to verify the existence or value of the assets listed on the borrower's and guarantor's financial statements; (c) the loan "cashed out" the borrower's investment in the collateral and shifted the risk of the declining market to the Bank; (d) there was an over concentration of credit with the borrower and guarantor; (e) the loan proceeds were not used for the stated purpose of the loan; (e) the borrower had no cash equity in the collateral; (f) the Defendants failed to obtain any appraisals of several of the homes and failed to obtain an appraisal until after the loan was funded on the other homes; (g) the appraisals obtained revealed that the loan exceeded LTV limits; and (h) the Defendants ignored the falling Las Vegas residential real estate market.

79.    The loan analysis memorandum stated as follows: "Due to the slowing of the real estate market in Las Vegas, the borrower decided they would finance all models in order to have excess funds available."  Thus, the loan analysis memorandum disclosed that, due to the slowing

market, the borrower was having cash flow problems, and, as a result, wanted to cash out its investment and have the Bank undertake the risk in its place.

80.     The Bank's total extensions of credit to the principals in Wagner Homes were over $28 million upon approval of the Wagner Homes I loan.  Although the Loan Policy required special attention to concentrations of credit over $20 million, the Defendants failed to exercise due care in underwriting and approving this loan.

81.     Despite being labeled as a loan refinance, this loan was an operating loan for Wagner Homes, and the borrower took $664,885.66 at closing with no strings attached.  The Loan Policy required cash equity of at least 15 percent, however, once this cash-out took place, there was no equity left in the Wagner Homes project.  These facts were apparent from the loan analysis memorandum.

82.     The Loan Policy, federal regulations, and prudent lending standards required appraisals to be prepared for real estate loans that exceed $250,000.  No appraisals for the Wagner Homes I loan were prepared prior to approval or closing of the loan.  After closing, appraisals of only some of the homes were prepared, but the values in the appraisals were less than the values stated in the loan analysis memorandum. Once an appraisal was conducted, the LTV ratio was at least 92.4 percent, which was in violation of Loan Policy, federal regulations and prudent lending standards.

83.     Defendants were grossly negligent and violated prudent lending standards by ignoring numerous red flags that were disclosed to them in the loan analysis memorandum:  The Las Vegas housing market was slowing.  Las Vegas was 14th in foreclosures among the largest 100 metropolitan areas. The loan analysis memorandum further disclosed that: "Chief among those being foreclosed on are investors who purchased homes during 2004, 05, and 06 with

minimal down payments just as the market began to soften.  They were unable to resell them for a quick profit and/or lease the property and are now holding mortgages they can't afford." Finally, there was no verification of the borrower's or guarantors' financial statements.

84.     Defendants Lundstrom, Laphen, Williams, Hoskins, McConnell, Spence, Kidd and Hartman were grossly negligent and in breach of their fiduciary duties in connection with the Wagner Homes I transaction and have caused damages related thereto estimated to be at least $870,000.

### Wagner Homes II

85.     On June 27, 2008, Defendants Laphen and Lundstrom approved a loan to Wagner Homes, Inc. in the amount of $3.553 million ("Wagner Homes II").  Defendant Kidd recommended this loan.  The loan was a twelve month construction loan to build eleven homes.

86.     The loan violated the Bank's Loan Policy, federal regulations, and prudent lending standards because: (a) the borrower was having cash flow problems; (b) the Defendants failed to verify the existence or value of the assets listed on the borrower's and guarantors' financial statements; (c) there was an over concentration of credit with the borrower and guarantor; (d) the Defendants failed require that the complete contracts to purchase the homes, which were the basis of the loan, be provided and reviewed before approval; (e) the Defendants ignored the collapse of the Las Vegas residential real estate market; and (f) the loan violated the LTV limits.

87.     By the time of approval, it was widely known that the Las Vegas residential real estate market was crashing and the U.S. economy was in serious trouble.  The loan analysis memorandum disclosed the following litany of problems:

> In their October 2007 report, MGIC rated the Las Vegas market as "Soft" with no change projected for the short-term.  MGIC states that the Las Vegas economy is continuing its correction.  Residential sales activity saw a 34% decline in single-

family homes and a 41% decline in condominiums.  New home sales were also off more than 40%.  The current supply of housing is estimated at 14 months, but it was also reported that about half of the homes for sale are vacant.  Home price appreciation is flat; however, it is already declining on a quarter-over-quarter basis.  Las Vegas was reported to have the third highest foreclosure rate in the country.  Even apartment vacancies are on the rise.

88.    The loan analysis memorandum stated that the borrower had executed sales contracts with the same purchaser for all 11 units for $459,950 each, but that the deposit on each contract was only $1,000, which was "low" and "atypical."  The Defendants were grossly negligent in failing to conduct due diligence on the contracts.  If such due diligence had been performed by the Defendants, they would have learned that the seller's remedy for breach of contract was limited to the $1,000 deposit, which made the contracts easily avoided by the buyer, which is exactly what happened after closing of the Wagner II loan.

89.    Moreover, the Defendants should have required due diligence to ascertain all of the terms of the contracts.  Such due diligence would have revealed that the purchase prices in the contracts were grossly overstated, and that due to rebates, commissions and other amounts flowing back to one purchaser from Wagner Homes, the actual purchase prices would have resulted in a 98.2 percent LTV ratio in violation of the Loan Policy.

90.    The loan analysis memorandum did not disclose that a feasibility report prepared for the Bank had found that "the contracts appear dubious," that the houses as constructed would be worth only $385,000 per unit, nearly $75,000 less than reflected in the proposed contracts and the appraisals referenced in the memorandum.

91.    There was no verification of the borrower or guarantors' financial statements, and such verification would have disclosed that the borrower and guarantors were in serious financial distress at the time of the recommendation and approval of the Wagner II loan.

92.     Defendants Laphen, Lundstrom and Kidd were grossly negligent and in breach of their fiduciary duties in connection the Wagner Homes II transaction and have caused damages related thereto estimated to be at least $1.9 million.

### Rising Sun Homes, LLC

93.     On April 19-20, 2006, Defendants Laphen, Lundstrom and Williams approved a loan to Rising Sun Homes, LLC ("Rising Sun") in the amount of $2.744 million. The loan was to fund construction of three model single-family homes and ten single-family production homes in Las Vegas.  Defendant Kidd recommended the loan.

94.      The loan violated the Loan Policy, federal regulations, and prudent lending standards because: (a) the borrower and guarantors were not creditworthy for a loan of this magnitude; (b) the borrower and guarantors had no experience in the construction business much less the construction of homes: (c) the borrower and guarantors proposed to use a method of construction that was unfamiliar to contractors in the Las Vegas market; (d) the Defendants failed to require an approved budget; and (d) Defendant Kidd approved advances on the loan that were not commensurate with the work completed.

95.     The loan analysis memorandum disclosed that the borrower and the three principals of the borrower, who were also guarantors, had neither the liquidity nor the assets to provide any support for repayment of the loan.  The project was in a high-crime area of Las Vegas, and the principals had no experience as developers or builders.  In fact, the principals of Rising Sun were engineers, who worked at a nuclear testing site and were not experienced in real estate development or construction.

96.     Rising Sun attempted to build the houses using a modular construction technique that was unfamiliar to contractors in the Las Vegas area, and was more expensive than traditional construction methods.  Defendants were grossly negligent in failing to perform any due diligence

regarding whether Rising Sun was reasonably capable of building the project within budget, in failing to require an approved budget, in extending large credits to uncreditworthy illiquid low net worth borrowers and guarantors, and in failing to determine if the Rising Sun homes could be sold upon completion at a price high enough to repay the loan.

97.     The Loan Policy, federal regulations, and prudent lending standards provide that loan disbursements should not exceed actual development and construction outlays.  Defendant Kidd was grossly negligent in approving all of the disbursements without verifying that construction was commensurate with the advances, and Defendants Laphen and Lundstrom were grossly negligent in approving a loan disbursement system for the Las Vegas LPO, which allowed advances to be made without compliance with the Loan Policy, federal regulations, and prudent lending practices.  The local government required that the three partially completed houses be destroyed because they were hazardous.

98.      Defendants Laphen, Lundstrom, Williams and Kidd were grossly negligent and in breach of their fiduciary duties in connection with the Rising Sun transaction and have caused damages related thereto estimated to be at least $2.3 million.


## FIRST CLAIM FOR RELIEF- GROSS NEGLIGENCE
## (AGAINST ALL DEFENDANTS)

99.     Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1-98 of this Complaint, as though fully set forth herein.

100.    Section 1821(k) of FIRREA holds directors or officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

101.    As officers and/or directors, Defendants owed the obligation to exercise the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances.  This duty of care included, but was not limited to, the following:

a.      To inform themselves about proposed loans and the risks the loans pose before they approved them;

b.      To approve loans that conformed to the Loan Policy and prudent lending standards;

c.      To ensure that any loans they approved were underwritten in a safe and sound manner;

d.      To ensure that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss; and

e.      To ensure that any loans they approved did not violate applicable banking regulations, the Loan Policy and/or create unsafe and unsound concentrations of credit.

102.    For each of the Transactions, the Defendants breached their duties and were grossly negligent by their actions and inactions, including, but not limited to, the following:

a.      Causing ADC loans to be made without proper analysis of the borrowers' ability to repay them;

b.      Failing to inform themselves about the risks the Transactions posed before they approved them;

c.      Approving Transactions that violated the Loan Policy and/or prudent lending standards;

d.      Failing to ensure that the Transactions were underwritten in a safe and sound

manner;

e.      Failing to ensure that the Transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss;

f.      Failing to ensure that the Transactions did not violate applicable banking regulations or create unsafe and unsound concentrations of credit;

g.      Failing to take action to prevent the reoccurrence of any unsafe or unsound banking practice that came to their attention;

h.      Recommending and/or approving large high-risk ADC loans in an unfamiliar volatile market (Las Vegas), which violated federal regulations, the Loan Policy, and prudent lending practices;

i.      Creating a bonus system that incentivized the origination of large, fee-producing loans in Las Vegas, without accountability for loan performance;

j.      Maintaining underwriting and loan approval systems that ensured that lending decisions would be based on incomplete or inaccurate information;

k.      Violating or allowing violations of the Loan Policy and federal regulations relating to draws on ADC loans, which resulted in numerous ADC loans being fully funded even though the projects were incomplete or in some instances non-existent;

l.      Abdicating their responsibilities as officers and directors;

m.      Acting in an *ultra viries* manner by, among to other things, violating the Loan Policy, safe and sound lending standards, and federal regulations; and

m.      Failing to investigate material facts.

103.    In addition, Defendants breached their duties and were grossly negligent in recommending and/or approving one or more of the loans identified in the Complaint, because they knew or should have known that each such loan involved one or more of the following characteristics, which increased the risk of default:

a.      Failure to obtain takedown commitments;

b.      Excessive LTV or LTC ratios;

c.      No appraisal or a deficient or incomplete appraisal;

d.      Making advances on ADC loans that were not commensurate with the work completed;

e.      Reliance on inaccurate or incomplete information in loan packages, which resulted from poor loan approval systems maintained by the Defendants;

f.      A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial ability to repay the loan;

g.      Insufficient proof of pre-sales and/or necessary market demand;

h.      Insufficient collateral;

i.      Undisclosed conflicts of interest;

j.      Provision of inaccurate or incomplete information in loan packages;

k.      Failure to verify financial information provided by borrowers and guarantors;

l.      Plans for repayment based on sales of developed lots when there were no funds budgeted for development;

m.      Lack of an approved budget;

n.      Ignoring known poor market conditions;

o.      Acting in an *ultra viries* manner by, among to other things, violating the Loan

Policy, safe and sound lending standards, and federal regulations; and

      p.     Continuing to lend to borrowers who demonstrated unreliability, dishonesty or inability to pay.

      104.    Each Defendant was grossly negligent in his or her manner of carrying out his or her duties and responsibilities, as further described in this Complaint.

      105.    As a direct and proximate result of Defendants' gross negligence, the FDIC-R suffered damages in an amount to be proven at trial, in excess of $40 million.

### SECOND CLAIM FOR RELIEF- BREACH OF FIDUCIARY DUTIES
### (AGAINST ALL DEFENDANTS)

      106.    Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1-105 of this Complaint, as though fully set forth herein.

      107.    As officers and/or directors, Defendants owed fiduciary duties of care, prudence and loyalty to act with the ordinary care of a prudent and diligent person, and in the best interests of the Bank, which included the duty to be reasonably informed about the manner in which the Bank's business was conducted, and the design, implementation, and operation of lending policies to protect against excessive risk. That duty included, but was not limited, to a duty to ensure the lending policies complied with safe and sound lending practices including the following duties:

      a.     To adopt such careful, reasonable and prudent policies and procedures, including those related to lending and underwriting, as required to ensure that there were no unsafe and unsound banking practices, and to ensure that business was conducted in accordance with these policies and procedures;

      b.     To communicate to the loan officers and underwriters a clear expectation that they must adhere to sound lending policies and credit underwriting by establishing a

system of checks and balances and by careful monitoring of loan officers'
conduct;

c.    To require that sufficiently detailed, current and reliable information be provided
upon which the directors and officers could make prudent decisions;

d.    To support and foster internal risk management functions;

e.    To enforce policies and procedures designed to ensure that loans would not be
made based on inadequate or inaccurate information;

f.    Upon receiving notice of an unsafe or unsound practice, to make a reasonable
investigation thereof and to exercise reasonable business judgment with respect to
all facts that a reasonable investigation would have disclosed, by acting with such
care, including reasonable inquiry, as an ordinarily prudent person in a like
position would use under similar circumstances;

g.    To conduct business in compliance with all applicable state and federal laws and
regulations;

h.    To inform themselves about proposed loans and the risks the loans posed before
they determined whether to approve them;

i.    To approve only those loans that conformed to the Loan Policy and prudent
lending standards;

j.    To ensure that any loans they approved and/or recommended were underwritten
in a safe and sound manner;

k.    To ensure that loans they approved were secured by sufficiently valuable
collateral to prevent or minimize the risk of loss; and

l.    To ensure that any loans they approved did not violate applicable banking

regulations and/or create unsafe and unsound concentrations of credit.

108.    Defendants breached their fiduciary duties by, among other things:

a.    Failing to ensure that the design, implementation and operation of the lending policies met appropriate standards;

b.    Adopting and/or implementing unreasonable and imprudent lending and underwriting policies and procedures that amounted to unsafe and unsound banking practices with respect to loans;

c.    Causing ADC loans to be made with little or no regard for borrowers' ability to repay them;

d.    Failing to ensure proper review and approval of ADC loans originated in the Las Vegas LPO, which comprised a significant portion of the total loan portfolio;

e.    Failing to ensure that the Transactions were underwritten in a safe and sound manner;

f.    Failing to ensure that the Transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of loss;

g.    Failing to take all necessary actions upon loan approval to ensure that the Bank obtained and monitored its security interests in the collateral securing the Transactions;

h.    Failing to ensure that lending procedures, including those utilized in regard to Transactions, did not violate applicable banking regulations or create unsafe and unsound concentrations of credit; and

i.    Failing to take action to prevent the reoccurrence of any unsafe or unsound banking practice that came to their attention.

109.    In committing the foregoing breaches, the Defendants acted clearly unreasonably under the circumstances known to them at the time, were not reasonably informed, and otherwise wholly abdicated their corporate responsibilities by closing their eyes to known risks, did not act in complete good faith and did not act with the belief that their actions were in the best interests of the Bank.

110.    Defendant Kidd breached the duty of loyalty owed by recommending the Towne Vistas I loan, which his business partner personally profited from.

111.    As a direct and proximate result of Defendants' breach of fiduciary duties, the FDIC-R suffered damages in an amount to be proven at trial, in excess of $40 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the FDIC-R requests relief from Defendants as follows:

A.    For compensatory and consequential damages, jointly and severally, in a minimum amount of $40 million and any excess amount to be proven at trial;

B.    For its costs of suit against all Defendants;

C.    For prejudgment interest;

D.    For attorneys' fees, and costs for the investigation and litigation;

E.    For such other and further relief as this Court deems just and proper.

## JURY DEMAND AND REQUEST FOR PLACE OF TRIAL

The FDIC-R demands a jury for all issues herein triable by a jury and requests that Omaha, Nebraska be designated as the place of trial.

Respectfully submitted,


By: */s Mark F. Enenbach*
**McGRATH NORTH MULLIN & KRATZ, PC LLO**
Mark F. Enenbach, No. 15202
James J. Frost, No. 16560
James J. Niemeier, No. 18838
First National Tower, Suite 3700
1601 Dodge Street
Omaha, NE 68102
Telephone:  (402) 341-3070
Fax:  (402) 341-0216

**MULLIN HOARD & BROWN, L.L.P.**
David Mullin, No. 14651600
Robert Bell, No. 0787062
Richard Biggs, No. 24064899
500 South Taylor, Suite 800
Amarillo, Texas  79101
Telephone:  (806) 372-5050
Fax:  (806) 372-5086

ATTORNEYS FOR PLAINTIFF IN
INTERVENTION, FEDERAL DEPOSIT
INSURANCE CORPORATION